Filed 10/2/15  P. v. Gardner CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>DENNIS LAMAR GARDNER,<br><br>　　　　Defendant and Appellant. | A140627<br><br>(Solano County<br>Super. Ct. No. VCR216764) |

Dennis Lamar Gardner appeals from a conviction of grand theft person entered upon his plea of no contest and the three-year prison sentence imposed after his probation was revoked.  He contends the trial court abused its discretion in denying his motion to withdraw his plea.  We affirm.

**STATEMENT OF THE CASE**

Appellant was charged by information filed on January 23, 2013, with second degree robbery (Pen. Code, § 211), a serious felony within the meaning of section 1192.7, subdivision (c), and a violent felony within the meaning of section 667.5, subdivision (c).  It was alleged that appellant had suffered a prior conviction for a serious felony (§ 667, subd. (a)(1)) and two prison priors (§ 667.5, subd. (b)).

On February 4, 2013, appellant moved for new appointed counsel to replace his appointed public defender (*People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*)). Appellant complained that he and his attorney were having problems communicating and

1

his attorney was prioritizing other cases over his.[1]  After hearing from the attorney, the court denied the motion.

Jury selection began on March 19, 2013.  Appellant made another *Marsden* motion, which was denied after a hearing.[2]  Another *Marsden*-type hearing was conducted on March 20 at the suggestion of defense counsel and the court again declined to relieve appointed counsel.[3]  Presentation of the case to the jury began that day:  The victim, an eyewitness, the responding police officer and a defense expert witness on eyewitness identification testified.

On the next court day, March 26, appellant entered into a plea agreement:  The information was amended to add a second count charging grand theft person (§ 487, subd. (c)), and appellant pled no contest to this charge; the robbery charge and a pending misdemeanor case were dismissed with *Harvey* waivers; the enhancement allegations were dismissed outright; and appellant admitted a probation violation with the understanding that probation would be granted and he would be released that day.  The written plea agreement included a waiver of the right to appeal, which appellant initialed.  The court suspended imposition of sentence and placed appellant on three years formal

---

[1] Appellant was frustrated that his attorney had not filed a motion to dismiss and that his case was not moving more quickly.  His attorney explained that he did not see a legal basis for the motion to dismiss, he was currently in midst of a murder trial, investigative work was being done on appellant's case, and the case was proceeding on a no time waiver basis.

[2] Appellant told the court he and his attorney were disagreeing about "certain aspects of this trial" and it was causing friction between them.  Counsel explained that he and appellant had some disagreements about jurors appellant wanted to excuse and about whether appellant should testify.  Appellant said there was evidence he believed critical to the case that was "not even being brought to this trial" and he did not understand why his attorney was saying the evidence could not be presented to the court.

[3] Counsel expressed concern that appellant's disappointment over the denial of his *Marsden* motion the day before was affecting how he appeared to the jury, to appellant's detriment.  Counsel stated that when he tried to talk to appellant to work things out, appellant made clear that he wanted any attorney but this one.  The court held that how appellant presented himself to the jury was within his control and not a ground for relieving counsel.

probation. Among other conditions of probation, appellant was ordered to stay 100 yards away from King's Market at 1624 Fairgrounds Avenue, except that he was permitted to be on the sidewalk at the bus stop.

On April 19, appellant appeared in court after being arrested for violating the stay-away order. The court appointed the public defender's office, summarily revoked probation, and set the matter for trial.

On June 17, appellant filed a written *Marsden* motion; at a hearing on June 20, his public defender (not trial counsel, who had since moved to the Conflict Defender's office) explained that appellant believed he had received ineffective assistance of counsel at the prior trial and when he entered his no contest plea, as a result of which appellant wanted to withdraw his plea. The court granted the *Marsden* motion, making clear it was doing so because of the "difficult spot" an attorney from the public defender's office would be in and not because there had been ineffective assistance of counsel. On June 28, the court appointed a new attorney to represent appellant.

In August, the court granted counsel's request for a transcript of the testimony from appellant's trial, which counsel needed to review to rule out ineffective assistance of counsel as a ground for withdrawal of appellant's plea. On August 30, the court heard and denied appellant's *Marsden* motion as to his new attorney.[4]

On September 17, counsel filed a motion to withdraw appellant's plea based on the claim that when appellant entered the plea, his free will had been overcome by fear that, due to the breakdown of the attorney client relationship, his attorney was not making his best efforts to achieve an acquittal and, as a result, appellant would be convicted of the more serious charge and enhancement. Appellant submitted a handwritten section

---

[4] At the hearing, appellant voiced a complaint about the lineup procedures used in the prior trial and about a witness trial counsel had declined to call, and his new attorney was now saying she could not call. He also complained about his new attorney having not yet filed the motion to withdraw his plea.

3

995 motion. At a hearing on October 15, appellant testified[5] and the motion to withdraw the plea was denied.

On November 4, the court heard and denied another *Marsden* motion.[6]

The probation revocation hearing was held on November 12.[7] The court found that appellant violated probation and referred the matter to the probation department for a supplemental report. On December 20, the court sentenced appellant to the aggravated term of three years, with 658 days of presentence credit. The court terminated probation

---

[5] Appellant testified that trial counsel did not file any motions on his behalf, did not subpoena the witnesses appellant asked him to subpoena, and refused to present evidence on appellant's behalf, stating that it was up to the prosecution to prove appellant guilty. The witnesses appellant wanted called included an alibi witness, whom counsel declined to call because she was drunk when counsel spoke with her, and the officer who suggested putting appellant in the lineup. Appellant explained that another officer, Corporal Darden, told the arresting officer to put appellant in the lineup because he fit the description of the suspect, but at a section 402 hearing, "when the actual description of the suspect was given, he said that I would not fit the description of the suspect." "[T]he attorney said he would not use him at trial. That—that's what forced me to take this plea, because I didn't have anything in my defense." Asked why he did not feel trial counsel was making his best efforts to win the trial, appellant said trial counsel was "ineffective towards representing me," that he would not have entered the plea if he had been represented correctly, and that the plea was on the advice of trial counsel. According to appellant, trial counsel advised him to take the plea because he "didn't like the jury itself, that he picked, and I wasn't allowed to pick my own jury."

[6] Appellant complained that counsel had filed the withdrawal of plea motion without knowledge of the prior case, having only received documents from the prior attorney, and that the court did not hear "appropriate and reasonable oral argument" on the motion. Appellant wanted to be provided with transcripts of the February 4 and March 19 Marsden motions, and wanted his attorney to be given a chance to add grounds to the motion to withdraw plea. Counsel told the court that she had advised appellant that if they proceeded with the withdrawal motion on October 15 rather than postponing the hearing to potentially add an ineffective assistance of counsel claim, he would be waiving the issue of ineffective assistance of counsel because the court only had jurisdiction to entertain the motion for six months.

[7] Police Officer Steven Darden testified that about 7:49 a.m. on March 30, 2013, he saw appellant among a group of men loitering under the overhang at the rear of King's Market. Darden was aware of appellant's stay away order and immediately took him into custody. Appellant said he was waiting for the bus, but the bus stop was about a block away.

unsuccessfully in two other cases. The sentencing hearing was completed on December 24, appellant having been removed from the courtroom on December 20 due to an outburst.

Appellant's attorney filed a timely notice of appeal on December 27, 2013. She did not request a certificate of probable cause. In July 2014, appellant obtained permission from this court to seek a certificate of probable cause from the trial court. On August 18, we granted appellant's motion to augment the record on appeal to include his declaration, which attached the trial court's order granting appellant's request for a certificate of probable cause.

## STATEMENT OF FACTS

On December 29, 2012, Eva Jimenez was at the Laundromat at Fairgrounds Plaza in Vallejo, opposite Kings Market, sitting on a chair in front of the bathroom while her clothes were drying. She was wearing two necklaces, a gold chain worth about $200 and a devotional scapular. A man who was coming from the direction of the bathroom lunged at her, grabbed her necklaces and pulled hard, several times. He ripped off the gold necklace and left the Laundromat. Jimenez described the man as "tall," African-American, wearing blue jeans and a gray sweatshirt. Using her young son as a translator, Jiminez told the police that the man weighed about 180 pounds and had no facial hair; when she said he was taller than her husband, the police estimated the man was about six feet tall. Jiminez did not see the man's whole face and would not recognize his face.

Daniel Swartz was in the Laundromat doing his family's laundry at the time of the incident. A person he identified at trial as appellant walked inside and headed for the bathroom. Swartz testified that he noticed appellant immediately because he was "a little bit on high alert," feeling uneasy due to the presence of a group of African-American men hanging out in front of the Laundromat, with a thick smell of marijuana coming from the group. The number of men in the group varied over the course of the morning but there were about 10 at the time of this incident. Swartz was the only Caucasian in the vicinity and felt a bit like a "fish out of water," and he was keeping "a very close eye" on his surroundings and the group of men. Swartz had a clear view of appellant's face as

5

appellant walked toward the bathroom. Appellant was about 15 feet from where Swartz was folding clothes and nothing obstructed Swartz's view of appellant's face and upper torso.

After a few minutes in the bathroom, appellant came out and walked down Swartz's aisle, holding a "fan" of dollar bills out around his belt line, then stuffing the money into his pocket. Appellant walked "right past" Swartz, coming within inches of him; Swartz was keeping a close eye on appellant, including his face, and estimated his height at "5-10 or 5-11." Appellant appeared to be heading for the door but at the last second he lunged at the woman who was sitting on a bench by the door with both his hands around her neck. Swartz started toward them but, noting that the group of men outside were looking in, decided to call 911 instead of intervening himself. He went into the bathroom and reported to 911 that a woman was being assaulted. When Swartz came out of the bathroom, appellant was gone; the police arrived fairly quickly and, by the time they arrived, none were left of the group outside the Laundromat. Swartz told the police that the suspect was an African-American male, about "5-10, possibly 5-11," 170 or 175 pounds, and "well-built," with "handsome characteristics," "neat" hair, and a dark complexion, wearing a black tee shirt and blue jeans, and said he was sure he could identify the suspect. He did not recall telling the officer that the suspect had no facial hair, but testified that he did not recall the suspect having facial hair. Asked if he later told the defense investigator that the suspect had stubble, Swartz said that was possible: He did not recall a beard or goatee but "there may have been stubble."

Responding to the Laundromat, Police Officer Theresa Agustin spoke first with Jimenez, through her son, then with Swartz. The description of the suspect included in the police report indicated six feet tall, 180 pounds, gray sweater and black pants; it did not indicate the suspect's complexion, although there was a specific box on the report for complexion. The next day, Agustin told Officer Darden about the incident and he

6

suggested that she put appellant in the photo lineup.[8]  She did so based on Darden's suggestion; neither Jimenez nor Swartz had described the suspect's face.

The police showed Swartz the photographic lineup two days after the incident, and Swartz identified appellant's photograph.  Swartz testified that he spent five to seven minutes reviewing the six photographs before making his selection because he wanted to be very careful in going through them, and that it is more challenging to identify a suspect from photographs than in court.[9]

---

[8] Police Officer Steven Darden testified at a section 402 hearing that on December 30, 2012, Officer Agustin told him about the robbery that had occurred the day before. Darden had been a police officer in Vallejo for over 18 years and the strip mall at 1624 Fairgrounds Drive had been part of his beat for at least 15 or 16 years.  Agustin described the suspect as a "black male, kind of scruffy, wearing a gray sweater," along with his height and weight; she answered affirmatively when Darden asked if the suspect was dark-skinned, and Darden said, " 'You know, I bet that was Dennis Gardner.' "  This was because the physical description matched and because a couple of weeks before, appellant had taken some money out of a woman's purse at the same Laundromat, then "took off running."  That woman had not wanted to file a report, and neither did a man appellant had beaten up three or four weeks previously.  Darden testified that appellant was the only person he knew of who had had an official stay away order from a liquor store, which Darden believed to be the result of several arrests he had made due to appellant's harassing of customers and staff, and panhandling, at King's Market.  Darden testified, "I think I focused on the fact that he was dark and scruffy because I had just seen him" and knew that his beard was unshaved.  He did not remember whether Agustin told him the suspect's height and weight or "just that he was kind of muscular."  Darden "assumed automatically" that the suspect was appellant.  Darden acknowledged that he had not seen the prior incidents he described but the victims had identified appellant and Darden believed appellant had gotten away with committing the offenses.  Darden knew appellant and had seen him wear a "gray, kind of cottony, athletic type jacket."  Asked whether a description of the suspect in this incident as six feet tall, 180 pounds, with no facial hair would be consistent with appellant's appearance and height and weight, Darden replied, "No."

[9] Swartz explained on cross examination that two photographs immediately "popped out" to him from the lineup, the first someone he had seen on television news in connection with a crime in Vallejo, and the second, someone who was definitely not the suspect because he looked "nothing like" what Swartz remembered.  Another two photos he "never considered" because they "didn't look anything like the suspect."  Swartz was "leaning toward" two photos with "a lot of the same facial characteristics," one of which

Psychologist Robert Shomer testified for the defense as an expert in perception, memory and eyewitness identification. He testified that eyewitness identification has a low level of reliability under the best of circumstances, and that in circumstances involving sudden, unexpected stressful events, the accuracy level drops even lower. The largest source of error in eyewitness identification is similarity in resemblance among people. This makes the initial description of an individual crucial because a specific detail helps separate out one similar looking person from another. Cross racial identification is significantly less accurate because "people tend to be grouped together if they look different than you." Factors such as sufficient light, time for observation and distance are necessary but do not guarantee an accurate identification.

Shomer was asked to describe the factors relevant to identification in the hypothetical situation of a Caucasian man doing laundry at a Laundromat who saw, from 20 to 30 feet away, an African-American man suddenly lunge at a woman, pull a necklace off her neck and run out; saw a group of about 15 black males standing outside the store; described the perpetrator as a black man in his 20s with a black T-shirt and blue jeans; and selected the person in the number two position of a photo lineup the next day. Shomer noted that this was a sudden, unexpected situation with a relatively high degree of stress, a perpetrator of a different race than the observer, and "some distance" between the observer and the subject, and that because of seeing the group outside the door, the observer might subsequently believe a person in the group was the perpetrator because that person looked familiar (the "bystander effect"). Shomer also testified that the person conducting the test should not know who the suspect is because he or she can unintentionally influence the results, and that there is a higher potential for error when the photographs are shown all at once rather than one at a time. An in-court identification does not provide an independent basis for accuracy of the identification and a witness's level of confidence is not a good indicator of accuracy.

was appellant's, but "ultimately, No. 2 [appellant's photo], it was quite evident to me, after studying the picture more carefully, that No. 2 was the suspect."

8

Appellant contends that the trial court abused its discretion in denying his motion to withdraw his plea, and that the waiver of the right to appeal in the plea agreement does not bar the present appeal.

## I.

An express waiver of the right to appeal made pursuant to a negotiated plea agreement is valid provided the waiver is knowing, intelligent and voluntary. (*People v. Panizzon* (1996) 13 Cal.4th 68, 80 (*Panizzon*); *People v. Vargas* (1993) 13 Cal.App.4th 1653, 1659 (*Vargas*).) "The voluntariness of a waiver is a question of law which appellate courts review de novo." (*Panizzon*, at p. 80; *Vargas*, at p. 1660.) The plea will generally preclude review of matters that occurred prior to the change of plea, "[a]lthough the issue of whether the guilty plea was informed and voluntarily made will always remain open for appellate review." (*In re Uriah R.* (1999) 70 Cal.App.4th 1152, 1157 (*Uriah*).)

"Because waivers of appellate rights are ordinarily found in the context of a plea bargain, the scope of the waiver is approached like a question of contract interpretation—to what did the parties expressly or by reasonable implication agree? (See [*Vargas*], *supra*, [13 Cal.App.4th] at pp. 1658–1659; *People v. Nguyen* (1993) 13 Cal.App.4th 114, 120.)" (*Uriah, supra,* 70 Cal.App.4th at p. 1157.) " ' "Waiver is ordinarily a question of fact. [Citation.]" [Citation.] It is defined as "[a]n intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver . . . must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and the conduct of the accused." [Citation.]

" ' "[T]he valid waiver of a right presupposes an actual and demonstrable knowledge of the very right being waived. [Citations.]" [Citation.] It " '[i]s the intelligent relinquishment of a known right after knowledge of the facts.' [Citation.]" The burden is on the party claiming the existence of the waiver to prove it by evidence that does not leave the matter to speculation, and doubtful cases will be resolved against a

waiver. [Citation.] The right of appeal should not be considered waived or abandoned except where the record clearly establishes it. [Citation.]' ([*Vargas*], *supra*, 13 Cal.App.4th at pp. 1661-1662.)" (*People v. Rosso* (1994) 30 Cal.App.4th 1001, 1006-1007.)

Appellant argues there is nothing in the record to indicate that at the time he entered his plea he understood he was waiving his right to appeal from a future motion to withdraw that plea. On its face, this argument appears reasonable: Presumably, neither a motion to withdraw a plea nor an appeal from the denial of such a motion would be within the parties' contemplation at the time the plea is entered. Moreover, the stated basis of appellant's motion to withdraw his plea was that the plea was not entered knowingly, intelligently and voluntarily. If this was true of the plea agreement generally, it follows that it would be true of the waiver of the right to appeal contained within the plea agreement.

Respondent asserts that the record demonstrates the waiver was knowing, intelligent and voluntary because appellant completed and signed a plea form, specifically initialing the section stating, "Even though I will be convicted in this case as a result of my plea, I have the right to appeal the judgment and rulings of the court. [¶] I give up my right of appeal." When asked by the court whether he signed the plea form "only after obtaining a full understanding of all the rights and consequences on the form," appellant replied, "Somewhat, Your Honor, yes." The court asked what appellant did not understand and appellant said, "The outcome." The court explained that appellant had been promised probation in exchange for his plea to grand theft person and, after discussion of some of the details of probation conditions—in particular, that there would be no requirement for drug testing—appellant stated that there was nothing else he did not understand.

"The written waiver of the right of appeal demonstrates, independent of the oral advisement by the court, defendant was informed sufficiently of this right to knowingly and intelligently waive it. (*People v. Castrillon* (1991) 227 Cal.App.3d 718, 722.)" (*Vargas, supra,* 13 Cal.App.4th at p. 1661.) The problem with respondent's argument,

10

however, is that nothing in the language of the plea agreement suggests the appeal waiver includes rulings made by the court *after* the waiver. *Vargas* found that a defendant who signed a plea form stating "I waive my appeal rights" was precluded from challenging on appeal the denial of a motion to continue and corresponding claim of deprivation of the right to effective assistance of counsel, but did not waive the right to appeal sentencing error occurring after the waiver was entered. (*Id*. at p. 1656.) As the court explained, "the general waiver of the right of appeal did not include error occurring after the waiver because it was not knowingly and intelligently made. Such a waiver of possible future error does not appear to be within defendant's contemplation and knowledge at the time the waiver was made. Any person in defendant's position would reasonably know that such a general waiver of appeal rights obviously included error occurring up to the time of the waiver; however, in our view, it is not reasonable to conclude that the defendant made a knowing and intelligent waiver of the right to appeal any unforeseen or unknown future error . . . ." (*Id.* at p. 1662.) These comments are equally applicable here: Nothing in the record indicates appellant knowingly and intelligently waived the right to appeal a future, unforeseen error by the trial court with respect to a motion to withdraw his plea.

Respondent further asserts that while appellant "ostensibly" contends his plea was not knowing, intelligent and voluntary, the substance of his motion to withdraw was the alleged breakdown of his relationship with his attorney at trial, not in connection with the plea agreement. Respondent points out that appellant's testimony at the hearing on the motion to withdraw concerned his complaints about his representation during the trial that preceded entry of his plea. According to respondent, appellant never claimed he misunderstood the terms of the plea, was misled into accepting the waiver of his right to appeal or involuntarily agreed to the plea. Respondent maintains appellant is attempting to indirectly challenge the trial court's denial of his *Marsden* motions, and appeal on *Marsden* grounds is precluded by his plea. (*People v. Lobaugh* (1987) 188 Cal.App.3d 780, 786.) Respondent further urges that any claim of ineffective assistance of counsel

11

would be unavailing in light of the advantageous plea bargain trial counsel obtained for appellant.

If supported by the evidence, respondent's view that appellant's true complaint is with his representation at trial and not that his free will was overborne would be a basis for denying the motion to withdraw the plea. The motion, however, was entirely based on the claim that appellant entered the plea under duress caused by the fear that, due to the breakdown of the attorney client relationship, trial counsel was not making his best efforts to achieve an acquittal. In fact, at the hearing, appellant expressly chose not to pursue a claim of ineffective assistance of counsel as a basis for the motion. Whether the showing he made was sufficient to establish the duress he claimed is a separate question from whether he is permitted to maintain this appeal. The waiver of the right to appeal was a part of the agreement appellant claims he entered under duress. As we have said, "the issue of whether the guilty plea was informed and voluntarily made will always remain open for appellate review[.]" (*Uriah, supra,* 70 Cal.App.4th at p. 1157.) It would make no sense to say that appellate review of the issue of voluntariness of a plea agreement is barred by a waiver contained in the agreement being challenged as involuntary.

## II.

Section 1018 authorizes the trial court to permit a defendant to withdraw a guilty plea "for a good cause shown." A plea of no contest is treated the same as a guilty plea for this purpose. (*People v. Ramirez* (2006) 141 Cal.App.4th 1501, 1506.) "Trial courts are expressly directed to give a liberal construction to the provisions of section 1018 in the interest of promoting justice." (*People v. Superior Court* (*Giron*) (1974) 11 Cal.3d 793, 796-797.) The decision whether to grant or deny a motion to withdraw is "within the sound discretion of the trial court and must be upheld unless an abuse thereof is clearly demonstrated." (*Id.* at p. 796.)

"To establish good cause to withdraw a guilty plea, the defendant must show by clear and convincing evidence that he or she was operating under mistake, ignorance, or any other factor overcoming the exercise of his or her free judgment, including

12

inadvertence, fraud, or duress. (*People v. Huricks* (1995) 32 Cal.App.4th 1201, 1207–1208.)" (*People v. Breslin* (2012) 205 Cal.App.4th 1409, 1416; *People v. Cruz* (1974) 12 Cal.3d 562, 566.) "However, '[a] plea may not be withdrawn simply because the defendant has changed his mind.' " (*Huricks*, at p. 1208, quoting *People v. Nance* (1991) 1 Cal.App.4th 1453, 1456.) Duress is not established where "[n]othing in the record indicates [the defendant] was under any more or less pressure than every other defendant faced with serious felony charges and the offer of a plea bargain." (*Huricks*, at p. 1208.)

Appellant argues that he established he was under significantly more duress than other defendants facing serious felony charges due to the total breakdown of his relationship with trial counsel. He maintains that counsel's refusal to call his alibi witness and others he believed crucial to his defense convinced him he had no one fighting on his behalf at trial; this belief was reinforced when counsel advised him to accept the plea deal because counsel had reservations about the jury (which counsel had picked without appellant's input); and as a result, he believed his only option was to accept the plea deal.

Although the asserted basis of appellant's claim is duress, the breakdown of the attorney client relationship that appellant described was due to disagreement over trial tactics. As appellant explained in his testimony at the hearing on the motion to withdraw his plea, he disagreed with his attorney's decisions not to call his alibi witness or the police officer who suggested putting appellant in the lineup. With respect to the latter, appellant apparently believed that the officer should have been called as a witness because, according to the officer's testimony at the Evidence Code section 402 hearing, the officer suggested putting appellant in the lineup despite acknowledging that appellant did not fit the description of the suspect given by Jimenez (six feet tall, 180 pounds and no facial hair). In essence, the problem was that appellant felt his attorney was not representing him effectively.[10] Indeed, when asked at the hearing on the motion to

---

[10] It appears doubtful that the point appellant seemed most concerned about—the police officer's testimony at the Evidence Code section 402 hearing that appellant did not fit the description of the suspect given by Jimenez—was as significant as appellant

13

withdraw his plea to explain the basis for his feeling that trial counsel "was not making his best effort to win the trial," appellant said trial counsel was "ineffective towards representing me" and "incompetent," and that he would not have entered the plea if he had been represented "correctly."

Decisions about trial tactics are generally within the authority of counsel. " 'When the accused exercises his constitutional right to representation by professional counsel, it is counsel, not defendant, who is in charge of the case. By choosing professional representation, the accused surrenders all but a handful of "fundamental" personal rights to *counsel's* complete control of defense strategies and tactics.' " (*In re Horton* (1991) 54 Cal.3d 82, 95, quoting *People v. Hamilton* (1989) 48 Cal.3d 1142, 1163; *People v. Hinton* (2006) 37 Cal.4th 839, 873-874.)

When appellant raised his disagreements with counsel in the form of *Marsden* motions, the trial court found he had not shown counsel was not providing competent

---

thought. According to appellant, when Darden heard about the robbery from another officer, he said he "bet" appellant was the perpetrator; he put appellant in the lineup because he was an "African-American male, scruffy, facial—unshaven beard, wearing a gray sweater," but the actual description was that the perpetrator was six feet tall, 180 pounds, with no facial hair, and Darden said at the 402 hearing that appellant would not fit this description.

Darden testified at the Evidence Code section 402 hearing that he suggested putting appellant in the lineup both because of Agustin's description of the suspect and because he knew appellant frequented the area where the offense occurred and had been involved in other offenses there. The description Agustin related to Darden was clearly based on what Swartz had reported (including dark complexion, "well-built" and possibly facial "stubble"), which was far more detailed than Jimenez's description and consistent with Darden's reference to a dark complexion, "scruffy" or "unshaven" face and "kind of muscular" build. Jimenez's description was less detailed than Swartz's, and, as to the few details she provided, not terribly different: Her weight estimate was 180 pounds while Swartz's was 170 or 175, and her height estimate, which was actually an estimate made by the police based on Jimenez's comparison of the suspect to her husband, was one to two inches taller than Swartz's. Jimenez, of course, saw the standing suspect from her sitting position while Swartz was standing and the suspect walked "right by" him. Given the information provided by Swartz, Darden's acknowledgement that appellant did not fit the less detailed description given by Jimenez does not appear to have much significance.

14

representation. Appellant has not challenged the decisions on these motions, nor, as we have said, is he directly claiming he should have been allowed to withdraw his plea due to ineffective assistance of counsel, a ground he expressly chose not to pursue in the trial court. Nevertheless, it is apparent from the record that what appellant is characterizing as duress overcoming his free will was in fact frustration over the denial of his *Marsden* motions and the fact that he was required to go through the trial with what he felt to be ineffective assistance of counsel. Appellant does not claim he did not understand what he was doing when he entered his plea or that he was improperly induced to enter the plea; he rests on the fear he claims to have felt due to counsel not adequately representing his interests. But appellant's own testimony at the hearing on the motion to withdraw his plea indicates that appellant—albeit frustrated with the perceived injustice being done him—made a considered decision to accept a highly advantageous plea agreement when he realized the trial was not likely to end favorably for him.

Appellant's testimony supports the conclusion he initially believed he would prevail at trial and entered his plea at a point when his confidence in a favorable outcome at trial had been derailed. Appellant testified that he had been offered several plea deals before his trial on the robbery charge—first, for a two-year sentence, next for probation after serving 30 days, and then for immediate release on probation—and refused each. As to the last of the offers, he testified, "I say, 'Bro, I'm not taking no probation.' But we had the trial; the trial started. I thought I was going to beat—beat it in trial, because everything was so misunderstanding." Appellant stated that the reason he later took the plea was that "I didn't have any fight for me at jury trial" and that he moved to withdraw the plea because "everything was wrong." When he was arrested for violating probation, appellant testified, "I told them that on this violation, since it was only a trespassing charge—and when I was on court probation, they usually would just give me two weeks, anyway. [¶] So [appointed counsel] told me that the Judge would not just give me time served, he was going to give me three years. So I said, 'Bro, if that's the case, you trying to get me more time for this violation from staying—for being at a store, for trespassing, I would like to take back my plea and have a jury trial."

15

These last remarks are telling, as is the fact that appellant did not raise his assertion that he entered the plea under duress caused by the breakdown of his relationship with trial counsel and belief that counsel was failing him at trial until he was found to have violated probation and was facing a prison term. Apparently, while he was enjoying the benefit of the plea agreement—immediate release on probation—appellant was content with the bargain he had made. He sought to withdraw his plea only when he realized that his violation of probation would result in a three-year prison term.

Appellant entered a plea bargain that was highly advantageous: A more serious charge was dismissed, as were prior conviction and prior prison allegations and a pending misdemeanor case, and instead of facing a prison term, appellant was released on probation. At the time appellant entered the plea agreement, the victim, eyewitness, and arresting officer had testified, as well as the defense expert witness, and it was clear from the evidence presented that appellant had been solidly identified. While there is no question appellant was frustrated with his attorney's failure to act on appellant's suggestions regarding witnesses and other trial matters, the record indicates he made a considered decision, at a point when it seemed clear the trial was not going his way, to enter a plea agreement that spared him likely conviction of a serious felony and a prison sentence. In these circumstances, we find no abuse of discretion in the trial court's denial of the motion to withdraw the plea.

We are not persuaded to the contrary by appellant's argument that the trial court denied his motion under an erroneous standard, considering only whether appellant had established mistake or ignorance but not considering the claim of duress overcoming appellant's free will. This argument is based on the court's statement, in denying the motion, "I have reviewed the plea form; it is in order. The defendant signed and indicated his knowledge and understanding of the situation at that time . . . . [¶] . . . [¶] It was done after all of the things that the defendant has complained about."

As we have said, the sole basis appellant presented for his motion to withdraw his plea was that he entered the plea due to a legitimate fear, caused by the breakdown of the attorney client relationship, that "overcame his exercise of free will." This was the only

16

ground asserted in the written motion to withdraw, which asserted that "[t]he inquiry must be into what was subjectively in [appellant's] mind" and the court "need not determine that trial counsel provided ineffective assistance of counsel or did anything wrong." A footnote in the motion indicated that appellant might add an "additional ground for withdrawal" after counsel was able to review the trial transcript. At the hearing, when defense counsel began to ask for a continuance because the trial transcript, which she needed to review in order to determine whether appellant had a viable claim of ineffective assistance of counsel, had only just been received, appellant interrupted and told counsel he did not want to pursue the additional claim. Defense counsel told the court she wanted to present evidence "to meet our claim that the reason [appellant] entered his plea in trial was a breakdown in the relationship with his attorney." When the prosecutor objected to appellant testifying, defense counsel explained that she was required to affirmatively show that appellant's plea "was induced by some kind of problem. And his claim is that the plea was induced because there was a breakdown with his attorney, and he did not trust his attorney. Unless the prosecutor is willing to stipulate that that is, in fact, true, I need to present some evidence of that, and the only way to do that is to have [appellant] testify to it." No issue was presented to the court regarding appellant's knowledge or understanding of the details of the plea agreement; the only issue was his claim of duress due to breakdown of the attorney client relationship.

" 'It is a basic presumption indulged in by reviewing courts that the trial court is presumed to have known and applied the correct statutory and case law in the exercise of its official duties. [Citations.]' " (*People v. Nance*, *supra*, 1 Cal.App.4th at p. 1456, quoting *People v. Mack* (1986) 178 Cal.App.3d 1026, 1032.) While the court made specific reference to appellant's knowledge and understanding of the plea, we will not assume the court ignored the "voluntariness" question that was the sole basis of the motion before it.

## DISPOSITION

The judgment is affirmed.

17

_____

Kline, P.J.


We concur:


_____

Richman, J.


_____

Stewart, J.